## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-23-00249-JD-001 |
| | ) | |
| THEANGLIOS WASHINGTON, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Defendant Theanglios Washington's ("Washington") Motion to Suppress ("Motion"). [Doc. No. 84]. Washington seeks to suppress all evidence found as a result of searching 812 S.E. 43rd Street, Oklahoma City, Oklahoma ("Washington address"). The Court held a hearing on the Motion on March 26, 2024. Having reviewed and considered all the exhibits, briefs, and testimony, the Court DENIES the Motion.

## I.   FINDINGS OF FACT[1]

The Drug Enforcement Administration ("DEA") began investigating Kevin Rutherford ("Rutherford"), one of Washington's codefendants, because Rutherford was suspected of manufacturing illegal pills containing controlled substances. In March 2023,

---

[1] Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to "state its essential findings on the record" when deciding a motion that involves factual issues. These findings of fact shall serve as the Court's essential findings for purposes of Rule 12(d). The Court makes these findings under the authority of Rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to a search. *See United States v. Merritt*, 695 F.2d 1263, 1269–70 (10th Cir. 1982).

the DEA received information that Customs and Border Protection intercepted a suspicious package in Oklahoma City from China addressed to Rutherford's girlfriend, Crystal Hammond, who is also one of Washington's codefendants. The package was a large, commercial-grade pill press that weighed approximately 140 pounds and was supposed to be delivered to 5801 Greenview Drive ("Greenview address"). However, before the package was delivered, a warrant was obtained, and a GPS tracker was placed on the pill press.

DEA conducted a controlled delivery of the pill press to the Greenview address. Rutherford was present when the pill press was delivered. Shortly after the delivery, Rutherford loaded the pill press into a black Chevrolet suburban and drove to the Washington address where Rutherford parked the suburban across the street. Rutherford and an unidentified black male then carried the pill press across the street toward the Washington address. The following day, the GPS location data was transmitted from the pill press and showed it was at 3300 N. Maloney Drive ("Maloney address"). Rutherford, Crystal Hammond, and their vehicles were continuously seen at the Maloney address by law enforcement.

Over the course of the next month and a half, Customs and Border Protection intercepted two additional packages addressed to Crystal Hammond at the Greenview address. The packages contained tablet press dies used to make pills and parts that appeared to be attachments to the pill press. DEA also observed vehicles driving between the Greenview address and the Maloney address. In one instance, Rutherford appeared to be taking one of the packages of tablet press dies and parts to the Maloney address.

2

DEA agents conducted several trash pulls at the Maloney address. They found small plastic bags that contained crystalline residue that tested presumptively positive for methamphetamine. They seized 12 plastic pill bottles that were labeled as having contained caffeine pills. In Agent Melodick's experience, these kinds of over-the-counter tablets are often ground up and mixed with illicit substances when individuals are manufacturing illicit tablets with a pill press. Multiple plastic baggies containing a blue powder, which was believed to be a necessary ingredient for pressing illicit tablets, were also seized. DEA found what appeared to be a blue "test" or "practice" pill that tested presumptively positive for fentanyl. Lastly, DEA seized drug paraphernalia such as plastic pill bottles, plastic baggies, and a small plastic bag with residue and blue powder that tested presumptively positive for fentanyl. At the time of one of the trash pulls, Rutherford's car was parked in the driveway of the Maloney address.

At the Maloney address, DEA observed a black male believed to be Lamar Bradford ("Bradford") put a cooler into the driver's side back seat of a gold Chrysler minivan. Bradford and a female believed to be Damareyonna Winston ("Winston"), left the Maloney address in the vehicle, and DEA surveilled the car as it drove. It drove in the direction of the Washington address but used side streets and avoided major highways despite that route being longer and slower. When it got close to the Washington address, it began driving circles around the area before pulling into the driveway of the Washington address. According to Agent Melodick, this is commonly referred to as a "heat run" and is intended to identify law enforcement surveillance.

Several days later, law enforcement conducted a trash pull at the Washington address but did not find anything of evidentiary value.

In late May, Agents Melodick and Wilson sought search warrants for the Greenview address, Washington address, and Maloney address. Before submitting them to a magistrate, Agent Wilson showed them to an Assistant United States Attorney ("AUSA") and asked the United States Attorney's Office ("USAO") whether they could proceed. At the hearing, the agents testified that this was not a rushed process and that, in addition to showing the AUSA, both agents reviewed the affidavit for accuracy.

After the AUSA signed off, Agent Melodick submitted near identical eleven-page affidavits in support of the warrants for each address. In the affidavits, she detailed her years of experience, training, and participation in other investigations. In addition to the previously stated facts, she explained that drug dealers frequently keep assets, records, documents related to their narcotics distribution organizations, and money derived from the sale of illegal narcotics in safe houses where they are not easily detectable by law enforcement officials conducting investigations. Further, she said that these individuals frequently maintain safe houses in the name of other individuals to also avoid detection by law enforcement agencies. She wrote that the aforementioned books, records, receipts, notes, ledgers, etc., are commonly maintained where the drug dealers have ready access to them, i.e., homes, automobiles, and safe houses. In her experience, mid- to upper-level drug suppliers are intelligent, experienced, and very good at hiding how, when, and where they conduct their illegal activities. The affidavit said that the primary method to prevent law enforcement from seizing the above items and conducting arrests, is to utilize

multiple locations to store contraband and documents related to their illegal drug distribution activities. In her experience mid- to upper-level drug suppliers routinely keep narcotics, drug proceeds, and ledgers separate from each other. Many times, this illegal drug related evidence is separated by maintaining these items at completely separate locations, residences, other buildings/dwellings, or with involved co-conspirators. Thus, in light of this knowledge and her observations from the investigation, she believed evidence of criminal activity would be found at the Washington address.

A district court of Oklahoma County judge signed the warrants. DEA simultaneously executed the warrants at each address and found a distribution quantity of methamphetamine, a wooden shipping box the size of the pill press, and a firearm inside the Washington address. Mr. Washington was present and arrested by DEA that same day at the Washington address.

Mr. Washington is charged by Indictment returned on June 20, 2023, with:

- Count 1, drug conspiracy from in or about March 2023 continuing thereafter through on or about June 1, 2023, in violation of Title 21, United States Code, Section 846;
- Count 4, possession of methamphetamine with intent to distribute on or about June 1, 2023, in violation of Title 21, United States Code, Section 841(a)(1);
- Count 6, possession of a firearm in furtherance of a drug trafficking crime on or about June 1, 2023, in violation of Title 18, United States Code, Section 924(c)(1)(A);
- Count 8, felon in possession of a firearm on or about June 1, 2023, in violation of Title 18, United States Code, Section 922(g)(1); and
- Count 10, maintaining a drug-involved premises on or about June 1, 2023, in violation of Title 21, United States Code, Section 856(a)(1).

The government also seeks forfeiture in the Indictment.

II.    **RELEVANT LAW AND ANALYSIS**

Washington challenges the search warrant's nexus with the Washington address and, alternatively, the agents' good faith reliance on the search warrant.[2] In response, the government asserts that the magistrate correctly issued the search warrant and that the agents relied on it in good faith.[3]

A.    **The search warrant had a sufficient nexus to the Washington address.**

Washington argues that the search warrant was not supported by probable cause because the affidavit only mentioned the Washington address twice and did not establish a nexus between the Washington address and the described illegal activity.

When analyzing whether a search warrant is supported by probable cause, the Court must look at the totality of the circumstances. *United States v. Cooper*, 654 F.3d 1104, 1124 (10th Cir. 2011). "Probable cause doesn't require proof that something is more likely true than false. It requires only a 'fair probability,' a standard understood to mean something more than a 'bare suspicion' but less than a preponderance of the evidence at hand." *United States v. Denson*, 775 F.3d 1214, 1217 (10th Cir. 2014) (quoting *United States v. Ludwig*, 641 F.3d 1243, 1252 & n.5 (10th Cir. 2011)).

---

[2] In the Motion, Washington argues he has standing to contest the constitutionality of the search of the Washington address because he had a reasonable expectation of privacy, as "he resided there for several months . . . ." Motion at 6. At the hearing, the parties stipulated that Washington has standing.

[3] The Court addresses both the nexus and good faith exception, as the parties have done in their briefing. At the hearing, the government's counsel's argument seemed to lean more on the good faith exception, but explained in detail why he also believed the nexus was sufficient.

"It is well-settled that for probable cause to exist there must be a 'nexus between [the contraband to be seized or] suspected criminal activity and the place to be searched.'" *United States v. Gonzales*, 399 F.3d 1225, 1228 (10th Cir. 2005) (quoting *United States v. Rowland*, 145 F.3d 1194, 1203 (10th Cir. 1998)) (alteration in original). "[A] sufficient nexus is established once 'an affidavit describes circumstances which would warrant a person of reasonable caution' in the belief that 'the articles sought' are at a particular place." *United States v. Biglow*, 562 F.3d 1272, 1279 (10th Cir. 2009) (quoting *United States v. One Hundred Forty-Nine Thousand Four Hundred Forty-Two & 43/100 Dollars ($149,442.43) in U.S. Currency*, 965 F.2d 868, 874 (10th Cir. 1992)). "[A]n affiant officer need not draw an explicit connection between a suspect's activities and his residence for a Fourth Amendment nexus to exist" and may link suspected illegal activity to the place to be searched "in the form of an affiant officer's statement that certain evidence—in his or her professional experience—is likely to be found in a defendant's residence." *Biglow*, 562 F.3d at 1279–80. "'[T]he nexus between the place to be searched and the evidence sought may be established through normal inferences about the location of [the] evidence.'" *United States v. Tisdale*, 248 F.3d 964, 971 (10th Cir. 2001) (quoting *United States v. Gant*, 759 F.2d 484, 488 (5th Cir. 1985)).

Here, Agent Melodick explicitly linked the Washington address to the criminal activity on two different occasions in the affidavit. The first instance involved Rutherford driving to the Washington address and parking across the street from the house. There, Rutherford and an unidentified black male unloaded the pill press and carried the pill

7

press toward the Washington address. Rutherford took the pill press to the Washington address the same afternoon it was delivered to the Greenview address.

In the second instance, Bradford and Winston drove a cooler from the Maloney address to the Washington address. The Maloney address was where law enforcement found indicators of manufacturing illegal tablets with a pill press and a "test" pill in the trash. As evidenced by the affidavit, this address appeared to be the hub of the drug trafficking operations. DEA also found methamphetamine and fentanyl in the trash of the Maloney address. When Bradford and Winston left the Maloney address, they went out of their way to avoid highways and circled the area of the Washington address in what Agent Melodick recognized as a "'heat run,' designed to identify law enforcement surveillance." [Doc. No. 84-1 at 10]. After conducting a heat run, they parked in the driveway of the Washington address.

Agent Melodick stated her belief that fruits, instrumentalities, and evidence of drug trafficking would likely be found at the Washington address. She based this belief on her training, experience, and knowledge of the investigation. In light of the evidence, a reasonable person would believe evidence of drug trafficking would be found at the Washington address. It is clear from the evidence that illegal activities were ongoing at the Greenview and Maloney address. The same individuals that frequented those addresses would then occasionally go to the Washington address. And on one of the times when they did so, they attempted to evade detection by law enforcement by using heat runs.

"The Fourth Amendment's strong preference for warrants compels [the Court] to resolve 'doubtful or marginal cases' by deferring to a magistrate judge's determination of probable cause." *Biglow*, 562 F.3d at 1282 (quoting *Massachusetts v. Upton*, 466 U.S. 727, 734 (1984)). Plus, since "probable cause is a matter of probabilities and common sense conclusions, not certainties," the Court finds that the affidavit here had a sufficient nexus between the illegal activity and the Washington address. *See Biglow*, 562 F.3d at 1279–80 (internal quotation marks and citation omitted).

### B.      Regardless, the agents relied on the search warrant in good faith.

Washington argues that the good faith exception is inapplicable because law enforcement's reliance on the search warrant in this case was wholly unreasonable. For support, Washington points to the trash pull at the Washington address which did not result in any evidentiary findings.

A "magistrate's determination that probable cause exists is entitled to great deference" and "officers are generally not required to second-guess the magistrate's decision in granting a warrant." *United States v. Gonzales*, 399 F.3d 1225, 1228–29 (10th Cir. 2005) (citations omitted). "Thus, the Supreme Court in *Leon* established that evidence obtained pursuant to a warrant that is later found to be defective is not properly excluded when the warrant is relied on by the officers in objective good faith." *Id.* at 1229 (referencing *United States v. Leon*, 468 U.S. 897 (1984)). But "the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be *objectively* reasonable." *United States v. Knox*, 883 F.3d 1262, 1272 (10th Cir. 2018) (emphasis added in *Knox*) (quoting *Leon*, 468 U.S. at 922). The

Supreme Court has stated that "the threshold for establishing this exception [to *Leon* admissibility] is a high one, and it should be." *Id.* at 1274 (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012)). "In recognition of this high standard, [the Tenth Circuit has] said that an officer is wholly unwarranted in relying on a warrant only if the affidavit submitted in support of the warrant is *devoid* of factual support." *Id.* (emphasis in original) (internal quotation marks and citation omitted).

Here, the warrant was not devoid of facts in support of searching the Washington address. It referenced the Washington address and detailed an investigation that took place over the course of a couple months. Agent Wilson also showed the USAO the affidavit before submitting it to a magistrate and asked if they could proceed; an AUSA said it "look[ed] good." *See* [Doc. No. 86-2]. Although the prosecution is not the arbiter of whether an affidavit is sufficient for Fourth Amendment purposes, this interaction shows the agents' good faith because it shows they were attempting to make sure the warrant complied with the legal standards.

Although the defense argues the failed trash pull shows reliance on the search warrant was unreasonable, as explained by Agent Wilson's testimony, the prosecution had already signed off on the affidavit before law enforcement conducted the trash pull. *Compare* [Doc. No. 86-2] (Wilson's email to AUSA on May 23, 2023, and AUSA Leverett's response email on May 25, 2023)], *with* [Doc. No. 84-4] (timing of trash pull being May 26, 2023). Moreover, Agent Wilson testified that the trash pull was conducted to gather additional intelligence on who lived at the Washington address—not to gather additional support for the warrant. Based on the timing of the trash pull being after the

10

AUSA's approval for the DEA agents to proceed, the Court finds this explanation to be credible.

For the good faith exception to be inapplicable, the affidavit supporting a warrant must only state "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *United States v. Chambers*, 882 F.3d 1305, 1311 (10th Cir. 2018) (quoting *United States v. Roach*, 582 F.3d 1192, 1204–05 (10th Cir. 2009)). Here, Agent Melodick provided several pages detailing her past experiences and training which, along with her observations from the investigation, formed the basis for her conclusions. Since "[a]n affidavit has enough factual support to justify reliance if it establishes a *minimally sufficient nexus* between the illegal activity and the place to be searched," and here the affidavit tied the Washington address to the illegal drug activity, the Court holds that the officers relied on the warrant in good faith. *See id.* (emphasis added in *Chambers*) (quoting *United States v. Henderson*, 595 F.3d 1198, 1202 (10th Cir. 2010)).

## III. <u>CONCLUSION</u>

For these reasons, the Court DENIES Defendant Theanglios Washington's Motion to Suppress.

IT IS SO ORDERED this 3rd day of July 2024.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE